Concurring opinion filed by Chief Judge Prost.
Wallach, Circuit Judge.
Appellees Allergan Sales, LLC and Allergan, Inc. (together, "Allergan") sued Appellants Sandoz, Inc. and Alcon Laboratories, Inc. (together, "Sandoz") in the U.S. District Court for the District of New Jersey ("District Court"), asserting that Sandoz's Abbreviated New Drug Application ("ANDA") No. 91-087 for a generic version of Allergan's ophthalmic drug Combigan® infringes U.S. Patent Nos. 9,770,453 ("the '453 patent"), 9,907,801 ("the '801 patent"), and 9,907,802 ("the '802 patent") (collectively, "the Patents-in-Suit") owned by Allergan. The District Court found limiting a number of "wherein" clauses in the Patents-in-Suit, Allergan Sales LLC v. Sandoz, Inc. , No. 2:17-cv-10129, 2018 WL 3675235, at *7 (D.N.J. July 13, 2018) (Opinion) (J.A. 5-25), and granted Allergan's motion for a preliminary injunction, Allergan Sales, LLC v. Sandoz, Inc. , No. 2:17-cv-10129 (D.N.J. July 13, 2018) (Order) (J.A. 1-4).[1]
Sandoz appeals. We possess jurisdiction pursuant to 28 U.S.C. § 1292 (2012). We affirm.
*1372 BACKGROUND
Entitled "Combination of Brimonidine and Timolol for Topical Ophthalmic Use," the Patents-in-Suit share a common specification that relates "to the topical ophthalmic use of brimonidine in combination with timolol ... for treatment of glaucoma or ocular hypertension." '453 patent col. 1 ll. 33-35.[2] The specification explains that the combination is "preferably formulated as 0.01 to 0.5 percent by weight brimonidine and 0.1 to 1.0 percent by weight timolol solution in water at a pH of 4.5 to 8.0, e.g. about 6.9." Id . col. 2 ll. 40-43. The specification states, however, that "[o]ther ingredients ... may be desirable," including "preservatives, co-solvents[,] and viscosity building agents." Id . col. 2 ll. 46-49.
"Example I" of the Patents-in-Suit is an exemplary "combination formulation" prepared to include 0.20% (w/v) brimonidine tartrate, 0.68% (w/v) timolol maleate,[3] 0.005% (w/v) benzalkonium chloride, an "isotonic phosphate buffer system at pH 6.9," and other ingredients. Id . col. 3 l. 59-col. 4 l. 6; see id . col. 4 ll. 7-24 (providing a Table of ingredients for the Example I formulation). The specification also describes a clinical study, referred to as "Example II," that "compare[d] the safety and efficacy of twice-daily dosed[4 ] brimonidine tartrate 0.2%/timolol 0.5% ophthalmic solution combination," i.e., the Example I formulation, "with that of twice-daily dosed timolol ophthalmic solution 0.5% ... and three-times-daily dosed[5 ] ALPHAGAN ® (brimonidine tartrate ophthalmic solution) 0.2% ... in patients with glaucoma or ocular hypertension." Id . col. 4 ll. 29-37. The study concluded that the Example I formulation "administered BID ... was superior to [t]imolol (timolol 0.5%) BID and [b]rimonidine (brimonidine tartrate 0.2%) TID in lowering the elevated [intraocular pressure ('IOP') ] of patients with glaucoma or ocular hypertension." Id . col. 9 ll. 2-6. The study also concluded that the Example I formulation "administered BID demonstrated a favorable safety profile that was comparable to [t]imolol BID and better than [b]rimonidine TID with regard to the incidence of adverse events and discontinuations due to adverse events." Id . col. 9 ll. 6-10. The Example II results are reflected in the disputed "wherein" clauses, which may be divided into two types: efficacy and safety, i.e., adverse events.
Independent claim 1 of the '453 patent is representative and recites:
A method of treating a patient with glaucoma or ocular hypertension comprising topically administering twice daily to an affected eye a single composition comprising 0.2% w/v brimonidine tartrate and 0.68% w/v timolol maleate, wherein the method is as effective as the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day and wherein the method reduces the incidence of one o[r] more adverse events selected from the group consisting *1373 of conjunctival hyperemia, oral dryness, eye pruritus, allergic conjunctivitis, foreign body sensation, conjunctival folliculosis, and somnolence when compared to the administration of 0.2% w/v brimonidine tartrate monotherapy three times daily.
Id . col. 9 l. 16-col. 10 l. 7 (emphases added).
DISCUSSION
I. Claim Construction
A. Standard of Review and Legal Standard
"The proper construction of a patent's claims is an issue of Federal Circuit law[.]" Powell v. Home Depot U.S.A., Inc. , 663 F.3d 1221, 1228 (Fed. Cir. 2011) (citation omitted). "[C]laim construction must begin with the words of the claims themselves." Amgen Inc. v. Hoechst Marion Roussel, Inc. , 457 F.3d 1293, 1301 (Fed. Cir. 2006) (citation omitted). "[W]ords of a claim are generally given their ordinary and customary meaning," i.e., "the meaning that the term would have to a person of ordinary skill in the art [ ('PHOSITA') ] in question at the time of the invention[.]" Phillips v. AWH Corp. , 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal quotation marks and citation omitted). "The words used in the claims are interpreted in light of the intrinsic evidence of record, including the written description, the drawings, and the prosecution history[.]" Teleflex, Inc. v. Ficosa N. Am. Corp. , 299 F.3d 1313, 1324 (Fed. Cir. 2002) (citation omitted). The PHOSITA "is deemed to read [a] claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification." Phillips , 415 F.3d at 1313.[6] Prosecution history may also be looked to in order to supply additional evidence of a claim term's intended meaning. See Home Diagnostics, Inc. v. LifeScan, Inc. , 381 F.3d 1352, 1356 (Fed. Cir. 2004).[7] While courts may also consider extrinsic evidence in claim construction, "such evidence is generally of less significance than the intrinsic record." Wi-LAN, Inc. v. Apple Inc. , 811 F.3d 455, 462 (Fed. Cir. 2016) (citation omitted).[8] Where, as here, the intrinsic evidence alone determines the proper claim construction, we review the district court's ultimate legal conclusion de novo. CardSoft, LLC v. VeriFone, Inc. , 807 F.3d 1346, 1350 (Fed. Cir. 2015) (citing Teva Pharm. USA, Inc. v. Sandoz, Inc. , 574 U.S. 318, 135 S. Ct. 831, 841-42, 190 L.Ed.2d 719 (2015) ).
B. The District Court Properly Construed the "Wherein" Clauses as Limiting
The District Court found the disputed "wherein" clauses to constitute claim limitations. Allergan Sales , 2018 WL 3675235, at *7. Specifically, the District Court *1374 "f[ound] that the 'wherein' clauses are limiting because they are material to patentability and express the inventive aspect of the claimed invention," viz., "Combigan®'s ability to reduce daily administrations from TID to BID without a loss of efficacy, and with reduced adverse events." Id . at *5-6. On appeal, Sandoz disputes the District Court's construction, arguing, inter alia, that: (1) the "wherein" clauses "merely state the intended results of administering Combigan[®] twice daily," Appellant's Br. 36; see id . at 36-49; and (2) the recited results are not "material to patentability," id . at 50; see id . at 50-62. We disagree with Sandoz.
Consistent with claim construction principles, we look first to the language of the claims, followed by the language of the specification and prosecution history. See Phillips , 415 F.3d at 1315. Independent claim 1 of the '453 patent recites both a representative efficacy "wherein" clause, '453 patent col. 9 l. 20-col. 10 l. 1 ("[W]herein the method is as effective as the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day."),[9] and a representative safety "wherein" clause, id . col. 10 ll. 1-7 ("[W]herein the method reduces the incidence of one o[r] more adverse events selected from the group consisting of conjunctival hyperemia, oral dryness, eye pruritus, allergic conjunctivitis, foreign body sensation, conjunctival folliculosis, and somnolence when compared to the administration of 0.2% w/v brimonidine tartrate monotherapy three times daily.").[10] Sandoz contends that these clauses "merely state ... intended results," Appellant's Br. 36, because they reflect the results of administering the Example I formulation, viz., Combigan®, as witnessed during the Example II clinical study, see, e.g. , id . at 36 ("The asserted method claims have one and only one step: administration of the claimed composition. Everything else is literally the results observed during clinical trials of Combigan[®]."); see also Minton v. Nat'l Ass'n of Sec. Dealers, Inc. , 336 F.3d 1373, 1381 (Fed. Cir. 2003) ("A whereby [or wherein] clause in a method claim is not given weight when it simply expresses the intended result of a process step positively recited."); Bristol-Myers Squibb Co. v. Ben Venue Labs. , Inc. , 246 F.3d 1368, 1376 (Fed. Cir. 2001) (explaining that claim language that "is only a statement of purpose and intended result" and that "does not result in a manipulative difference in the steps of [a] claim" is generally not limiting). We disagree. While we recognize some overlap between the language of the "wherein" clauses and those results, we must read the claims in view of the "entire specification." Sinorgchem Co., Shandong v. Int'l Trade Comm'n , 511 F.3d 1132, 1145 (Fed. Cir. 2007) (emphasis added); see Trs. of Columbia Univ. v. Symantec Corp. , 811 F.3d 1359, 1363 (Fed. Cir. 2016) ("[T]he specification *1375 is always highly relevant to the claim construction analysis and is, in fact, the single best guide to the meaning of a disputed term." (internal quotation marks and citation omitted)).
The specification of the Patents-in-Suit demonstrates that the claimed invention is ultimately a formulation (and methods of using that formulation) that allows for increased efficacy and safety, i.e., a decreased risk of adverse events. See '453 patent col. 1 ll. 48-53 ("[T]here is a need to increase the efficacy of many topical ophthalmic agents, without increasing the systemic concentration of such topical agents, since it is well known that many of such topically-applied ophthalmic agents cause systemic side effects, e.g. drowsiness, heart effects, etc."), col. 4 ll. 29-37 (explaining that the Example II clinical study was a comparative study of the "safety and efficacy" of the Example I formulation), col. 6 l. 2-col. 8 l. 14 (detailing "Conclusions" with regard to the "Efficacy" and "Safety" of the Example I formulation), col. 9 ll. 2-10 (explaining that the Example I formulation was found to be "superior ... in lowering the elevated IOP of patients with glaucoma or ocular hypertension" and "demonstrated a favorable safety profile ... with regard to the incidence of adverse events and discontinuations due to adverse events"). These benefits are described throughout the specification with reference to prior art topical ophthalmic treatments, viz., Timolol BID and "0.2% w/v brimonidine tartrate" TID, as recited in the claims; indeed, the Example II clinical study directly compares use of the Example I formulation with those prior art treatments and concludes that the claimed method is "superior" in both efficacy and safety. Thus, the specification demonstrates that Allergan believed the increased efficacy and safety of the claimed methods to be material to patentability.
Consistent with this understanding, Allergan relied on the efficacy and safety of the claimed methods during prosecution of the Patents-in-Suit in responding to the examiner's rejections. See Southwall Techs., Inc. v. Cardinal IG Co. , 54 F.3d 1570, 1579 (Fed. Cir. 1995) ("[A]rguments made during prosecution regarding the meaning of a claim term are relevant to the interpretation of that term in every claim of the patent absent a clear indication to the contrary."). For example, in distinguishing the claimed methods over the prior art, Allergan explained that the prior art
does nothing to teach or suggest that the claimed fixed combination of brimonidine tartrate and timolol maleate administered twice daily would be as effective as the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day, nor that administration of the claimed fixed combination would cause an unexpected reduction in adverse events.
J.A. 944; see J.A. 943 (disagreeing with the Examiner "that the reduction in side effects is inherently present in the prior art combination"), 944 (explaining that the prior art "does not teach or suggest that the claimed fixed combination of brimonidine tartrate and timolol maleate administered twice daily would be as effective as the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day" or cause "the unexpected reduction of adverse effects"). Allergan therefore argued that the improved efficacy and safety of the claimed methods were "unexpected results" that "underscore[d] the patentability and non-obviousness of the ... claims." J.A. 945; see J.A. 944-48.
Indeed, the Examiner explicitly relied on the "wherein" clauses in explaining why *1376 the claims of the Patents-in-Suit were "novel and non-obvious over the prior art." J.A. 977; see J.A. 975-77 (explaining, by the Examiner, the reasons for allowing the '453 patent application), 997-99 (explaining, by the Examiner, the reasons for allowing the '801 patent application), 1009-10 (explaining, by the Examiner, the reasons for allowing the '802 patent application). The Examiner explained that the prior art "data," consisting of "only ... a single data point for IOP," was insufficient to teach the recited efficacy limitations, see J.A. 976, 998, 1009, and credited Allergan with having shown that the prior art "fail[ed] to teach the reduction in adverse events as compared to the administration of 0.2% w/v brimonidine tartrate monotherapy three times a day as claimed," J.A. 976, 998 (same), 1009 (same); see ACCO Brands, Inc. v. Micro Sec. Devices, Inc. , 346 F.3d 1075, 1079 (Fed. Cir. 2003) (construing the asserted claims consistent with the examiner's reasons for allowance where the examiner simply reiterated "the arguments that the patentee had presented"). The prosecution history thus demonstrates that the formulation's efficacy and safety-as reflected in the disputed "wherein" clauses-were expressly relied on to define the claimed methods and distinguish them from the prior art.
Accordingly, having reviewed the intrinsic evidence, we are persuaded that the "wherein" clauses are material to patentability and thus limiting. See Hoffer v. Microsoft Corp. , 405 F.3d 1326, 1329 (Fed. Cir. 2005) ("[W]hen [a] 'whereby' [or 'wherein'] clause states a condition that is material to patentability, it cannot be ignored in order to change the substance of the invention.").
We are not persuaded by Sandoz's primary counterarguments, including Sandoz's reliance on Bristol-Myers , 246 F.3d 1368, In re Copaxone Consolid. Cases , 906 F.3d 1013 (Fed. Cir. 2018), and Georgetown Rail Equip. Co. v. Holland, L.P. , 867 F.3d 1229 (Fed. Cir. 2017). See generally Appellant's Br.; Appellant's Reply Br.; Oral Arg. http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-2207.mp3. In Bristol-Myers we expressly noted that the disputed claim terms "w[ere] voluntarily made after the examiner had already indicated ... the claims were allowable" and such "unsolicited assertions of patentability made during prosecution do not create a material claim limitation." 246 F.3d at 1375. Likewise, in Copaxone we held that the disputed claim terms were not "necessary or relevant to the examiner's approval." 906 F.3d at 1024. Finally, in Georgetown Rail we explained that the disputed claim terms were not relied upon during prosecution to "distinguish the patented invention from the prior art." 867 F.3d at 1238. Here, however, both Allergan and the Examiner explicitly relied on the "wherein" clauses to distinguish the claimed methods over the prior art during prosecution. The "wherein" clauses were neither unnecessary nor irrelevant, but were instead material to the Examiner's patentability determination.[11]
CONCLUSION
We have considered Sandoz's remaining arguments[12] and find them unpersuasive.
*1377 Accordingly, the Opinion and Order of the U.S. District Court for the District of New Jersey is
AFFIRMED

The parties fail to specify the asserted claims, see generally Appellant's Br., Appellee's Br., but they do not contest the District Court's list of disputed "wherein" clauses, see J.A. 2-4. Accordingly, we rely upon the District Court's undisputed list.

Because the Patents-in-Suit share a common specification, we cite to only the '453 patent for ease of reference unless otherwise specified.

The specification explains that 0.68% (w/v) timolol maleate is equivalent to 0.5% (w/v) timolol, free base. '453 patent col. 3 ll. 61-63, col. 4 ll. 7-21.

A twice-daily dosing frequency is referred to as "BID." See, e.g. , '453 patent col. 2 ll. 35-37.

A thrice-daily dosing frequency is referred to as "TID." See, e.g. , '453 patent col. 5 ll. 20-21.

The "specification includes both the written description and the claims of the patent." Cisco Sys., Inc. v. TQ Delta, LLC , 928 F.3d 1359, 1362 (Fed. Cir. 2019) (internal quotation marks and citation omitted).

A patent's prosecution history "consists of the complete record of the proceedings before the [U.S. Patent and Trademark Office ('USPTO') ]," providing "evidence of how the [US]PTO and the inventor understood the patent." Phillips , 415 F.3d at 1317 (citation omitted).

"[E]xtrinsic evidence ... consists of all evidence external to the patent and prosecution history." Phillips , 415 F.3d at 1317 (internal quotation marks and citation omitted).

Independent claim 1 of the '802 patent recites a similar efficacy "wherein" clause. '802 patent col. 9 ll. 16-19 ("[W]herein the method is as effective at reducing intraocular pressure as the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day.").

Independent claim 1 of the '801 patent recites a similar safety "wherein" clause. '801 patent col. 9 l. 32-col. 10 l. 3 ("[W]herein said method reduces the incidence of one or more adverse events, as compared to the administration of 0.2% w/v brimonidine tartrate monotherapy three times per day, wherein the adverse event is selected from the group consisting of conjunctival hyperemia, oral dryness, eye pruritus, allergic conjunctivitis, foreign body sensation, conjunctival folliculosis, and somnolence.").

Neither Allergan nor Sandoz disputes that because we affirm the District Court's determination that the "wherein" clauses are limiting, the District Court's granting of Allergan's preliminary injunction should likewise be affirmed. See Appellant's Br. 34 ("The district court's preliminary injunction decision rises and falls with its claim construction."), 67 ("The district court's grant of a preliminary injunction rises and falls with its claim construction. Indeed, the court's likelihood of success analysis turns entirely on claim construction."); Appellee's Br. 56-57; Appellant's Reply Br. 35-36 ("Both the public interest and the balance of equities rise and fall with claim construction here[.]"). Accordingly, we affirm the District Court's granting of Allergan's motion for preliminary injunction.

Sandoz's argument that the District Court erred by considering this Court's earlier decisions in Allergan, Inc. v. Sandoz Inc. , 726 F.3d 1286 (Fed. Cir. 2013), and Allergan Sales, LLC v. Sandoz, Inc. , 717 F. App'x 991 (Fed. Cir. 2017), Appellant's Br. 62-67, is mistaken. Indeed, the District Court was well within its discretion to consider those decisions concerning related patents to support its claim construction determination. See V-Formation, Inc. v. Benetton Group SpA , 401 F.3d 1307, 1312 (Fed. Cir. 2005) ("The district court properly referred to a related, non-binding judicial opinion to support its [claim construction] conclusion in this case.").